# EXHIBIT A

**ELECTRONICALLY FILED**
DOC ID: 39485532
CASE NO: 2026-LA-0000337
DATE: 8/12/2026 5:00 PM
BY: J P, DEPUTY

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT**
**WINNEBAGO COUNTY, ILLINOIS**

| | |
|---|---|
| Shazunum LLC, an Illinois limited liability company, and Shadeux LLC, an Illinois limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>Zunum Aero, INC., a Delaware corporation; Ashish Kumar, individually; and B. Matthew Knapp, individually,<br><br>Defendants, | Case No. 2026-LA-0000337 |

## Complaint

Plaintiffs, Shazunum LLC and Shadeux LLC (collectively, "Plaintiffs"), by and through their attorneys, Patterson Law Firm LLC, bring this Complaint against Defendants, Zunum Aero, Inc. ("Zunum"), Ashish Kumar ("Kumar") and B. Matthew Knapp ("Knapp") (collectively, "Defendants"), and in support thereof state as follows:

## Parties

1. Plaintiff Shazunum LLC ("Shazunum") is an Illinois limited liability company with its principal place of business in the State of Illinois.

2. Plaintiff Shadeux LLC ("Shadeux") is an Illinois limited liability company with its principal place of business in the State of Illinois.

3. Defendant Zunum Aero, Inc. ("Zunum" or the "Company"), formerly

known as Tzunum, Inc., is a Delaware corporation with its principal address at 19820 North Creek Parkway, Bothell, Washington 98011 (later 2205 152nd Ave NE, Redmond, Washington 98052). Zunum is in the business of developing hybrid-electric aircraft.

4. Defendant B. Matthew Knapp ("Knapp") is an individual who resides, on information and belief, at 10936 167th Ave NE, Redmond, Washington 98052-2752. At all times relevant to this Complaint, Knapp served as Founder and Secretary of the Board of Zunum Aero, Inc.

5. Defendant Ashish Kumar ("Kumar") is an individual who resides, on information and belief, at 17610 NE 8th Place, Bellevue, Washington 98008. At all times relevant to this Complaint, Kumar served as the Chief Executive Officer and co-founder of Zunum Aero, Inc.

**Jurisdiction and Venue**

6. Jurisdiction is appropriate pursuant to Article VI, Section 9 of the Illinois Constitution.

7. Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because the transactions, or some part thereof, out of which the cause of action arose occurred in Winnebago County, Illinois. Both Note Purchase Agreements and Promissory Notes are expressly governed by the laws of the State of Illinois and require that any civil action or legal proceeding arising out of or relating to them be brought in the courts of Winnebago, Illinois.

## General Allegations

8. Zunum Aero, Inc. is a hybrid-electric aircraft startup company that was founded with the purported goal of developing a new generation of small, efficient, hybrid-electric regional aircraft.

9. At all times relevant hereto, Kumar served as CEO and co-founder of Zunum, and Defendant Knapp served as Founder and Secretary of the Board of Zunum.

10. In or about November and December 2018, Zunum, through Kumar and Knapp, solicited investments from Plaintiffs in the form of bridge financing, premised on the representation that an imminent equity financing round would be led by Boeing HorizonX Ventures, LLC ("Boeing").

11. On November 7, 2018, Zunum and Plaintiff Shazunum LLC entered into a Note Purchase Agreement (the "Shazunum NPA"), attached hereto as Exhibit A, pursuant to which Shazunum provided $250,000 in consideration to Zunum. On the same date, Zunum executed a Promissory Note in favor of Shazunum LLC in the principal amount of $250,000, with a Maturity Date of March 7, 2019 (or ten (10) days after the closing of a Next Equity Financing generating gross proceeds of at least $4,900,000, whichever was earlier) (the "Shazunum Note"), attached hereto as Exhibit B. The Shazunum NPA was signed on behalf of Zunum Aero, Inc. by Kumar in his capacity as CEO.

12. On December 19, 2018, Zunum and Plaintiff Shadeux LLC entered

into a Note Purchase Agreement (the "Shadeux NPA"), attached hereto as Exhibit C, pursuant to which Shadeux provided $250,000 in consideration to Zunum. On the same date, Zunum executed a Promissory Note in favor of Shadeux LLC in the principal amount of $250,000, with a Maturity Date of June 19, 2019 (or ten (10) days after the closing of a Next Equity Financing generating gross proceeds of at least $10,000,000, whichever was earlier) (the "Shadeux Note"). Attached hereto as Exhibit D. The Shadeux NPA was signed on behalf of Zunum Aero, Inc. by Knapp in his capacity as Founder and Secretary of the Board.

13. Each of the Note Purchase Agreements provided for a $30,000 loan origination fee payable at maturity and default interest at the rate of 19% per annum accruing from the applicable Maturity Date. Each Note and Note Purchase Agreement is governed by Illinois law.

14. Both the Shazunum NPA and the Shadeux NPA contained an identical express representation at Section 4.8 ("Boeing HorizonX Ventures, LLC"), which states: "To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ('Boeing') regarding Boeing's future investments in the Company or Boeing's involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing."

15. The Section 4.8 representation was critical to Plaintiffs' decisions to invest. It was critical that Boeing remained committed to its investment relationship with Zunum and that a Boeing-led equity financing was imminent. Plaintiffs would not have invested $250,000 each as bridge financing, on the terms offered, absent the assurance that Boeing's relationship with Zunum was intact.

16. Unbeknownst to Plaintiffs at the time, Boeing had a negative relationship with Zunum at the time, with undisclosed negative communications.

17. Boeing refused to further invest.

18. Boeing's refusal to invest virtually eliminated the chance of an equity investment from any aerospace entity and, had Plaintiffs been aware of Boeing's refusal, they would have required at least a significant equity grant and control provisions rather than the warrant terms actually offered to Plaintiffs.

19. Neither Note's Warrants were ever issued to Plaintiffs.

20. Section 6.7 of each Note Purchase Agreement ("Expenses") provides:

> *"If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."*

21. Plaintiffs demanded payment but Zunum Aero, Inc. refused to pay on the notes.

**Count I**
**Breach of Promissory Note (Shazunum Note)**
**(Against Defendant Zunum Aero, Inc.)**

22. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 above as though fully set forth herein.

23. On November 7, 2018, Zunum Aero, Inc. and Shazunum LLC entered into a Note Purchase Agreement (the "Shazunum NPA"), pursuant to which Shazunum agreed to lend, and did lend, $250,000 to Zunum. Ex. A.

24. On November 7, 2018, in connection with the Shazunum NPA, Zunum executed and delivered a Promissory Note in favor of Shazunum LLC (the "Shazunum Note") in the principal amount of $250,000. Ex. B.

25. The material terms of the Shazunum Note include: (a) principal amount of $250,000; (b) Maturity Date of March 7, 2019 (or ten (10) days after the closing of a Next Equity Financing generating gross proceeds of at least $4,900,000, whichever was earlier); (c) a $30,000 loan origination fee payable at maturity; and (d) default interest at the rate of 19% per annum.

26. The Shazunum NPA and Shazunum Note constitute valid and enforceable contracts between Shazunum LLC and Zunum Aero, Inc.

27. Shazunum LLC fully performed its obligations under the Shazunum NPA and Note by funding the full $250,000 to Zunum Aero, Inc.

28. Zunum Aero, Inc. breached the Shazunum Note by failing to repay the principal amount of $250,000, the $30,000 loan origination fee, and

all accrued interest by the Maturity Date of March 7, 2019, and continues to be in breach to this date.

29. As a direct and proximate result of Zunum Aero, Inc.'s breach, Shazunum LLC has been damaged in an amount including, but not limited to: (a) unpaid principal of $250,000; (b) the unpaid $30,000 loan origination fee; and (c) default interest at 19% per annum accruing from March 7, 2019 and continuing to accrue through the date of judgment.

WHEREFORE, Plaintiff Shazunum LLC respectfully requests that this Court enter judgment in its favor and against Defendant Zunum Aero, Inc. as follows:

A. Compensatory damages in an amount to be proven at trial, including unpaid principal of $250,000, the $30,000 loan origination fee, and default interest at 19% per annum from March 7, 2019, through the date of judgment;
B. Reasonable attorneys' fees, costs, and necessary disbursements pursuant to Section 6.7 of the Shazunum NPA;
C. Pre-judgment and post-judgment interest as allowed by law; and
D. Such other and further relief as this Court deems just and proper.

**Count II**
**Breach Of Promissory Note (Shadeux Note)**
**(Against Defendant Zunum Aero, Inc.)**

30. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 above as though fully set forth herein.

31. On December 19, 2018, Zunum Aero, Inc. and Shadeux LLC entered into a Note Purchase Agreement (the "Shadeux NPA"), pursuant to which Shadeux agreed to lend, and did lend, $250,000 to Zunum. Ex. C.

32. On December 19, 2018, in connection with the Shadeux NPA, Zunum

executed and delivered a Promissory Note in favor of Shadeux LLC (the "Shadeux Note") in the principal amount of $250,000. Ex. D.

33. The material terms of the Shadeux Note include: (a) principal amount of $250,000; (b) Maturity Date of June 19, 2019 (or ten (10) days after the closing of a Next Equity Financing generating gross proceeds of at least $10,000,000, whichever was earlier); (c) a $30,000 loan origination fee payable at maturity; and (d) default interest at the rate of 19% per annum accruing from the Maturity Date.

34. The Shadeux NPA was executed on behalf of Zunum Aero, Inc. by Defendant B. Matthew Knapp in his capacity as Founder and Secretary of the Board. The Shadeux Note is governed by Illinois law.

35. The Shadeux NPA and Shadeux Note constitute valid and enforceable contracts between Shadeux LLC and Zunum Aero, Inc.

36. Shadeux LLC fully performed its obligations under the Shadeux NPA and Note by funding the full $250,000 to Zunum Aero, Inc.

37. Zunum Aero, Inc. breached the Shadeux Note by failing to repay the principal amount of $250,000, the $30,000 loan origination fee, and all accrued interest by the Maturity Date of June 19, 2019, and continues to be in breach to this date.

38. As a direct and proximate result of Zunum Aero, Inc.'s breach, Shadeux LLC has been damaged in an amount including, but not limited to: (a) unpaid principal of $250,000; (b) the unpaid $30,000 loan origination fee; and (c) default interest at 19% per annum accruing from

June 19, 2019 and continuing to accrue through the date of judgment.

WHEREFORE, Plaintiff Shadeux LLC respectfully requests that this Court enter judgment in its favor and against Defendant Zunum Aero, Inc. as follows:

A. Compensatory damages in an amount to be proven at trial, including unpaid principal of $250,000, the $30,000 loan origination fee, and default interest at 19% per annum from June 19, 2019, through the date of judgment;
B. Reasonable attorneys' fees, costs, and necessary disbursements pursuant to Section 6.7 of the Shadeux NPA;
C. Pre-judgment and post-judgment interest as allowed by law; and
D. Such other and further relief as this Court deems just and proper.

**Count III**
**Breach of Shazunum NPA**
**(Against Defendant Zunum Aero, Inc.)**

39. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 above as though fully set forth herein.

40. The Shazunum NPA is a valid and enforceable contract between Shazunum LLC and Zunum Aero, Inc.

41. Shazunum LLC fully performed its obligations under the Shazunum NPA by funding the full $250,000 to Zunum Aero, Inc.

42. Zunum Aero, Inc. breached Section 4.8, which states: "To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ('Boeing') regarding Boeing's future investments in the Company or Boeing's involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October

1, 2018 through the Closing."

43. Zunum Aero, Inc. breached this provision by failing to notify Plaintiff of all negative communication received.

44. As a direct and proximate result of Zunum Aero, Inc.'s breach, Shazunum LLC has been damaged through its investment which it would not have completed on the terms given absent the representation.

WHEREFORE, Plaintiff Shazunum LLC respectfully requests that this Court enter judgment in its favor and against Defendant Zunum Aero, Inc. as follows:

A. Compensatory damages in an amount to be proven at trial;
B. Reasonable attorneys' fees, costs, and necessary disbursements pursuant to Section 6.7 of the Shazunum NPA;
C. Pre-judgment and post-judgment interest as allowed by law; and
D. Such other and further relief as this Court deems just and proper.

**Count IV**
**Breach of Shadeux NPA**
**(Against Defendant Zunum Aero, Inc.)**

45. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 above as though fully set forth herein.

46. The Shadeux NPA is a valid and enforceable contract between Shadeux LLC and Zunum Aero, Inc.

47. Shadeux LLC fully performed its obligations under the Shadeux NPA by funding the full $250,000 to Zunum Aero, Inc.

48. Zunum Aero, Inc. breached Section 4.8, which states: "To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ('Boeing') regarding

Boeing's future investments in the Company or Boeing's involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing."

49. Zunum Aero, Inc. breached this provision by failing to notify Plaintiff of all negative communication received.

50. As a direct and proximate result of Zunum Aero, Inc.'s breach, Shadeux LLC has been damaged through its investment which it would not have completed on the terms given absent the representation.

WHEREFORE, Plaintiff Shadeux LLC respectfully requests that this Court enter judgment in its favor and against Defendant Zunum Aero, Inc. as follows:

A. Compensatory damages in an amount to be proven at trial;
B. Reasonable attorneys' fees, costs, and necessary disbursements pursuant to Section 6.7 of the Shadeux NPA;
C. Pre-judgment and post-judgment interest as allowed by law; and
D. Such other and further relief as this Court deems just and proper.

**Count V**
**Fraudulent Concealment**
**(Against Defendants Zunum Aero, Inc., Ashish Kumar and B. Matthew Knapp)**

51. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 above as though fully set forth herein.

52. Both the Shazunum NPA (dated November 7, 2018) and the Shadeux NPA (dated December 19, 2018) contained an identical representation at Section 4.8 stating: "To the Company's knowledge, the Company has not

received any negative communication from Boeing HorizonX Ventures, LLC ('Boeing') regarding Boeing's future investments in the Company or Boeing's involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing." This representation was false when made in both Agreements, one of which was signed by each individual Defendant.

53. Defendants hid negative communications from Plaintiffs.

54. Despite a duty to disclose the Boeing communications, instead Defendants concealed the negative communications with Boeing.

55. Defendants concealed this information intending Plaintiffs to rely upon the actual disclosed information.

56. Plaintiffs relied on the information which was disclosed, which included the representation concerning Boeing, and relied upon the absence of the negative information despite the affirmative obligation to so disclose.

57. Plaintiffs were harmed by the reliance in entering the Note Purchase Agreements and Notes, advancing the funds.

58. Zunum Aero, Inc. is vicariously liable for the false representations made by Kumar and Knapp in their capacity as officers and agents of the Company, as each executed the respective Note Purchase Agreements on behalf of and binding Zunum.

WHEREFORE, Plaintiffs Shazunum LLC and Shadeux LLC respectfully request that this Court enter judgment in their favor and against Defendants Zunum Aero, Inc., Ashish Kumar and B. Matthew Knapp, jointly and severally, as follows:

A. Compensatory damages in an amount to be proven at trial, including loss of principal, loan fees, warrant value, the difference between the terms received and the terms Plaintiffs would have demanded absent the fraud, and lost alternative investment returns;
B. Punitive damages in an amount sufficient to punish Defendants for their willful and intentional fraud and to deter similar conduct, pursuant to 735 ILCS 5/2-1207;
C. Extend the statute of limitations as a result of the fraudulent concealment;
D. Pre-judgment and post-judgment interest as allowed by law; and
E. Such other and further relief as this Court deems just and proper.

**Count VI**
**Fraud**
**(Against Defendants Zunum Aero, Inc., Ashish Kumar and B. Matthew Knapp)**

59. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 and 52 through 58 above as though fully set forth herein.

60. Both the Shazunum NPA (dated November 7, 2018) and the Shadeux NPA (dated December 19, 2018) contained an identical representation at Section 4.8 stating: "To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ('Boeing') regarding Boeing's future investments in the Company or Boeing's involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing." This

representation was false when made in both Agreements.

61. Zunum and Kumar, entering into the Shazunum NPA on November 7, 2018, knew or recklessly disregarded the falsity of the Section 4.8 representation as they were aware of the deteriorating Boeing relationship and knew that negative communications from Boeing existed.

62. Zunum and Knapp, who executed the Shadeux NPA as Founder and Secretary of the Board on December 19, 2018 knew or recklessly disregarded the falsity of the Section 4.8 representation as they were aware of the deteriorating Boeing relationship and knew that negative communications from Boeing existed.

63. Zunum Aero, Inc. is vicariously liable for the false representations made by Kumar and Knapp in their capacity as officers and agents of the Company, as each executed the respective Note Purchase Agreements on behalf of and binding Zunum.

64. Defendants made the false Section 4.8 representation with the intention of inducing Plaintiffs to fund the Note Purchase Agreements and accept the terms thereof, including bridge-financing terms premised on an imminent Boeing-led equity round.

65. Defendants intended that Plaintiffs would rely on the representation that Boeing's relationship with Zunum was intact, and would forgo demanding more protective investment terms such as immediate equity positions.

66. Plaintiffs justifiably relied on the Section 4.8 representation in agreeing to fund $250,000 under each Note Purchase Agreement with the agreed-upon terms. The representation was a bargained-for contractual warranty specifically addressing the Boeing relationship, which was the central premise of the investment.

67. Plaintiffs had no independent means of verifying Boeing's investment intentions and reasonably relied on Defendants' express contractual representation regarding the same.

68. But for the Section 4.8 representation, Plaintiffs would not have invested on the terms offered.

69. As a direct and proximate result of Defendants' fraud, Plaintiffs have been damaged including, but not limited to: (a) loss of $250,000 in principal invested by each Plaintiff; (b) loss of the $30,000 loan origination fees owed to each Plaintiff; (c) loss of the value of the Warrants (premised on a Next Equity Financing that Defendants knew would likely never occur); (d) the difference between the warrant terms received and the immediate equity position (at least 25% equity) that Plaintiffs would have demanded had the truth been disclosed; (e) lost alternative investment returns that Plaintiffs would have earned had they not invested in Zunum on the terms provided based on the false representations; and (f) other consequential damages.

70. Defendants' conduct was willful, wanton, and/or done with reckless indifference to the rights of Plaintiffs, warranting the imposition of

punitive damages.

WHEREFORE, Plaintiffs Shazunum LLC and Shadeux LLC respectfully request that this Court enter judgment in their favor and against Defendants Zunum Aero, Inc., Ashish Kumar and B. Matthew Knapp, jointly and severally, as follows:

A. Compensatory damages in an amount to be proven at trial, including loss of principal, loan fees, warrant value, the difference between the terms received and the terms Plaintiffs would have demanded absent the fraud, and lost alternative investment returns;
B. Punitive damages in an amount sufficient to punish Defendants for their willful and intentional fraud and to deter similar conduct, pursuant to 735 ILCS 5/2-1207;
C. Reasonable attorneys' fees and costs;
D. Pre-judgment and post-judgment interest as allowed by law; and
E. Such other and further relief as this Court deems just and proper.

**Count VII**
**Fraudulent Inducement**
**(Against Defendants Zunum Aero, Inc., Ashish Kumar, and B. Matthew Knapp)**

71. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 and 52 through 58 above as though fully set forth herein.

72. Defendants made the false Section 4.8 representation in both the Shazunum NPA and the Shadeux NPA specifically to induce Plaintiffs to execute and fund the Note Purchase Agreements. The Section 4.8 representation was not merely informational; it was a bargained-for contractual warranty that was specifically designed to address Plaintiffs' concerns regarding Boeing's continued involvement and was a condition precedent to Plaintiffs' willingness to invest.

73. Defendants knew or recklessly disregarded the falsity of the Section 4.8 representation when they executed the Shazunum NPA on November 7, 2018 and the Shadeux NPA on December 19, 2018.

74. Defendants included the Section 4.8 representation in the Note Purchase Agreements with the specific intent to induce Plaintiffs to execute the Agreements and fund the $250,000 under each at the terms given. Defendants knew that without assurance regarding Boeing's continued involvement, Plaintiffs would not have entered into the Agreements on the terms given.

75. Plaintiffs justifiably relied on the Section 4.8 representation in deciding to execute and fund the Note Purchase Agreements. But for the false Section 4.8 representation, Plaintiffs would not have entered into the Agreements on the terms given. Specifically, had Plaintiffs known that Boeing had declined to invest further in Zunum, Plaintiffs would have demanded a more significant, immediate equity position rather than warrants contingent on a Next Equity Financing that Defendants knew would likely never occur given Boeing's withdrawal.

76. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs were induced to enter into the Note Purchase Agreements and fund $250,000 each to Zunum on terms that were grossly unfavorable given the true state of the Boeing relationship.

77. Plaintiffs have been damaged including, but not limited to: (a) loss of $250,000 in principal invested by each Plaintiff; (b) loss of the $30,000

loan origination fees; (c) loss of the value of the Warrants (premised on a Next Equity Financing that Defendants knew would likely never occur); (d) the difference between the warrant terms received and the immediate equity position (at least 25% equity) that Plaintiffs would have demanded had the truth been disclosed; (e) lost alternative investment returns that Plaintiffs would have earned had they not invested in Zunum on the terms provided based on the false representations; and (f) other consequential damages.

78. Defendants' conduct was willful, wanton, and/or done with reckless indifference to the rights of Plaintiffs, warranting the imposition of punitive damages pursuant to 735 ILCS 5/2-1207.

WHEREFORE, Plaintiffs Shazunum LLC and Shadeux LLC respectfully request that this Court enter judgment in their favor and against Defendants Zunum Aero, Inc., Ashish Kumar and B. Matthew Knapp, jointly and severally, as follows:

A. Compensatory damages in an amount to be proven at trial, including loss of principal, loan fees, warrant value, the difference between the terms received and the terms Plaintiffs would have demanded absent the fraud, and lost alternative investment returns;
B. Punitive damages in an amount sufficient to punish Defendants for their willful and intentional fraudulent inducement and to deter similar conduct, pursuant to 735 ILCS 5/2-1207;
C. Reasonable attorneys' fees and costs;
D. Pre-judgment and post-judgment interest as allowed by law; and
E. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: August 12, 2026

/s/Michael Haeberle
Michael Haeberle
Patterson Law Firm, LLC
200 W. Monroe, Suite 2025
Chicago, IL 60606
PH: 312-223-1699
mhaeberle@pattersonlawfirm.com
*Attorney for Plaintiffs*

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT**
**WINNEBAGO COUNTY, ILLINOIS**

| | |
|---|---|
| Shazunum LLC, an Illinois limited liability company, and Shadeux LLC, an Illinois limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>Zunum Aero, INC., a Delaware corporation; Ashish Kumar, individually, and B. Matthew Knapp, individually,<br><br>Defendants, | Case No. |

**Affidavit Pursuant to Supreme Court Rule 222(B)**

Michael Haeberle, being first duly sworn on oath, deposes and states as follows:

1. I am one of the attorneys for Plaintiffs, Shazunum, LLC and Shadeux LLC, in this cause.

2. The total amount of money damages sought in this cause does exceed $50,000.

Further, affiant sayeth naught.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Michael Haeberle

# EXHIBIT A

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "***Agreement***") is made as of November 7, 2018 (the "***Effective Date***") by and between Zunum Aero, Inc. (formerly known as Tzunum, Inc.), a Delaware corporation (the "***Company***"), and Shazunum, LLC, an Illinois limited liability company (the "***Lender***").

## RECITALS

The Company desires to issue and sell and Lender desires to purchase, the Note (as defined below) on the terms and conditions set forth below.

## AGREEMENT

In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree to enter into this Agreement as follows:

1. Definitions.

(a) "***Consideration***" shall mean $250,000.00, which is the amount of money paid by Lender pursuant to this Agreement.

(b) "***Equity Securities***" shall mean the Company's Common Stock or Preferred Stock or any securities conferring the right to purchase the Company's Common Stock or Preferred Stock or securities convertible into, or exchangeable or exercisable for (with or without additional consideration), the Company's Common Stock or Preferred Stock, except any securities or rights to acquire securities that are: (i) issued or issuable by reason of a dividend or stock split, (ii) issued or issuable pursuant to the Company's equity incentive plan or compensatory arrangements approved by the Company's board of directors, including securities issuable upon exercise of such securities, (iii) issued or issuable to banks, equipment lessors or real property lessors pursuant to transactions approved by the Company's board of directors, or (iv) issued or issuable in connection with the Initial Public Offering.

(c) "***Initial Public Offering***" shall mean the closing of the issuance and sale of shares of Equity Securities of the Company in the Company's first underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "***Act***").

(d) "***Maturity Date***" shall mean, with respect to the Note issued under this Agreement, the earlier of (x) March 7, 2019, or (y) ten (10) days after the closing of the Next Equity Financing.

(e) "***Next Equity Financing***" shall mean the next sale (or series of related sales) by the Company Preferred Stock following the date of this Agreement from which the Company receives gross proceeds of not less than $4,900,000.00 (excluding the aggregate amount of debt securities converted into Preferred Stock upon conversion of any existing convertible notes issued by Company).

(f) "***Preferred Stock***" shall mean a new series of Company preferred stock with rights and preferences at least pari passu to the most senior equity security issued by Company, other than the issue price, which shall be calculated as provided in Section 1(g) below; *provided that* if the Company has authorized only one class of stock, a new series of Company preferred stock shall be created with rights senior to said class of stock as to liquidation and with other rights similar to customary series A preferred stock based on the National Venture Capital Association model legal documents.

(g) "***Shares***" shall, for purposes of determining the type of Equity Securities issuable upon exercise of the Warrants, mean the Preferred Stock issued in the Next Equity Financing.

(h) "***Warrant Exercise Price***" shall mean seventy-five percent (75%) of the price paid per share for Preferred Stock by the investors in the Next Equity Financing.

2. Terms of the Note.

2.1. Issuance of Note. In return for the Consideration paid by Lender, the Company shall sell and issue the Promissory Note to Lender as contemplated by this Agreement (the "***Note***"). The Note shall have a principal balance equal to the Consideration paid. The Note shall be due the Maturity Date. The Note shall be secured by that certain Security Agreement, dated of even date herewith entered into by Company and Lender (as amended, modified, restated and/or replaced from time to time, the "***Security Agreement***").

2.2. Loan Fee. Company shall pay to Lender a loan origination fee ("***Loan Fee***") in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00), payable upon the Maturity Date.

2.3. Attorney's Fees. Company shall pay to Lender at Closing the reasonable fees and expenses of the Lender's attorney related to this Agreement, in an amount not to exceed, in the aggregate, Five Thousand and 00/100 Dollars ($5,000,00).

2.4. Warrants.

(a) Terms. Upon the closing of the Next Equity Financing, the Company shall issue warrants to Lender for an aggregate exercise price equal to the principal balance of the Note plus the Loan Fee multiplied by 1.5 ("***Warrants***"). At least five (5) days prior to the closing of the Next Equity Financing, the Company shall notify the holder of each Note in writing of the terms under which the Preferred Stock of the Company will be sold in such financing. The strike price of the Warrants shall be the Warrant Exercise Price. The Warrants shall be exercised by the Lender no later than five (5) years after the closing of the Next Equity Financing. Notwithstanding any other provision to the contrary contained herein, the provision of this section shall survive the repayment of the Note by Company.

(b) Form of Warrant. The form of warrant, showing all rights and obligations thereunder, shall be provided to Lender as soon as practical after Closing, and shall be subject to the mutual agreement of the parties as to additional terms and conditions to be contained therein.

3. Closing Mechanics.

3.1. Closing. The closing ("*Closing*") of the purchase of the Note in return for the Consideration paid by Lender shall take place on the date of this Agreement.

3.2. Delivery. At the Closing, the Company will deliver to Lender the Note to be purchased by Lender, against receipt by the Company of the corresponding Consideration. The Note will be registered in Lender's name in the Company's records.

4. Representations and Warranties and Covenants of the Company. In connection with the transactions provided for herein, the Company hereby represents and warrants as of the Closing and, as applied to actions by the Company after the Closing, the following covenants to Lender:

4.1. Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

4.2. Authorization. Except for the authorization and issuance of the shares issuable in connection with the Warrants under Section 2.4, all corporate action has been taken on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Note and the Warrants. Except as may be limited by applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Note and the Warrants, the valid and enforceable obligations they purport to be. Prior to the issuance of the Warrants, the Company shall authorize sufficient shares of Preferred Stock and/or Common Stock, as applicable, to allow for issuance of the Warrants as described in Section 2.4.

4.3. Valid Issuance of Stock. The Shares to be issued, sold and delivered upon exercise of the Warrants will be duly authorized and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Lender in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

4.4. Compliance. The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations. The Company and its subsidiaries (if applicable, and hereafter all references to Company include any subsidiaries) have complied with, and are

presently in compliance with all legal requirements applicable to its business as currently conducted and as proposed to be operated as of the date hereof.

4.5. Capitalization. **Exhibit A** attached hereto represents a fully diluted capitalization table of the Company setting forth the number and class of shares held by each stockholder of the Company as of the Effective Date, and the total number of reserved, promised and granted options, warrants, and all other rights, promises or undertakings to subscribe for, purchase or acquire from the Company any share capital of the Company. The stockholders identified in **Exhibit A** are the lawful owners of record and, to the Company's knowledge, beneficial holders, of all of the issued and outstanding share capital of the Company as of the Effective Date and of all rights thereto, and the Company is unaware of the existence or creation of any liens, claims, charges, encumbrances, restrictions, rights, options to purchase, proxies, voting trust and other voting agreements, calls or commitments of any kind among them or between them and any third parties and none of such stockholder owns any other shares, options or other rights to purchase or acquire any share capital of the Company from the Company or, to the Company's knowledge, from each other.

4.6. Intellectual Property. The Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights (free and clear of any third party rights, liens, encumbrances or claims) to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights ("***Intellectual Property***") necessary for its business as now conducted and, to its knowledge, as currently proposed to be conducted, without, to the knowledge of the Company, any conflict with, or infringement of the rights of, others, nor has the Company ever received notice of any such infringement or alleged infringement of any Intellectual Property rights of any third party by the Company. To the Company's knowledge, no Intellectual Property owned by any third party is needed by the Company to conduct its business as currently conducted or as currently proposed to be conducted and that requires the payment of royalties to any third party, except to the extent the Company could obtain rights thereto on commercially reasonable terms. Neither the Company nor, to the Company's knowledge, any of the Company's directors, officers or employees, are obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that is expected to interfere with the use of his or her best efforts to promote the interests of the Company or that is expected to conflict with the Company's business as currently proposed to be conducted. Neither the execution nor delivery of this Agreement or the Note, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as currently conducted and as currently proposed to be conducted, is expected to conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument known to the Company under which any of such employees is now obligated. To the Company's knowledge, it will not be necessary to utilize any inventions of any of the Company's directors, officers or employees (existing, former or people it currently intends to hire) made prior to or outside the scope of their employment by or services to the Company. To the Company's knowledge, at no time in the course of the conception of or reduction of any of the Company's Intellectual Property, was any developer, inventor or other contributor to such Company Intellectual Property operating under any grants from any governmental entity or agency, university, or private source, or subject to any employment agreement, or invention assignment or nondisclosure agreement, or other

obligation with any third party, in each case, in a manner that could adversely affect or limit any Intellectual Property owned by or licensed to the Company, or which the Company otherwise has the right to use. To the Company's knowledge, none of the Company's current or former employees who contributed to the Company's Intellectual Property are or have ever been bound by any obligations towards any third party (including any other employer, government authority, or university) such that such third party may have any right or claim with respect to Intellectual Property developed, invented, discovered, derived, programmed or designed by such employee relating to the business of the Company, as currently conducted. All Company Intellectual Property developed by the existing and former founders of the Company, including any and all Intellectual Property developed prior to or following the incorporation of the Company was duly assigned by each such founder to the Company at the time of the incorporation of the Company or later, free and clear of any security interest. The Company has entered into agreements with each current or former employees and consultants who, either alone or in concert with others, contributed developed, invented, discovered, derived, programmed or designed the Company's Intellectual Property, pursuant to which any and all Intellectual Property necessary for or relevant to the Company's business as currently conducted and, to the Company's knowledge, as now proposed to be conducted, which has been developed or is currently being developed, by such employees or consultants during the course of their employment by or engagement with the Company, or which results from any work performed by the employees or consultants for the Company, or using the Company's facilities or resources, shall be the property solely of the Company for no additional consideration.

4.7. No Litigation. No action, proceeding or governmental inquiry or investigation is pending or, to the Company's knowledge, threatened against the Company or any of its officers, directors, or employees in their capacity as such, and there is no reasonable basis therefor known to the Company (including, without limitation, any action, proceeding, allegation or settlement involving workplace harassment, discrimination or other misconduct of any current or former officer, director, employee, consultant or other person affiliated with the Company), or against any of the Company's properties, assets and rights, including, without limitation, assets, licenses and rights transferred to the Company under any written agreement or other binding undertaking, before any court, arbitration board or tribunal or administrative or other governmental agency having jurisdiction over the Company. The foregoing includes, without limiting its generality, actions pending or threatened involving the prior employment of the Company's employees or use by any of them in connection with the Company's business of any information, property or techniques allegedly proprietary to any of their former employers or any other person. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.

4.8. Boeing HorizonX Ventures, LLC. To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ("***Boeing***") regarding Boeing's future investments in the Company or Boeings involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing.

5. Representations and Warranties of the Lender. In connection with the transactions provided for herein, Lender hereby represents and warrants to the Company that:

5.1. Authorization. This Agreement constitutes Lender's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. Lender represents that it has full power and authority to enter into this Agreement.

5.2. Purchase Entirely for Own Account. Lender acknowledges that this Agreement is made with Lender in reliance upon such Lender's representation to the Company that any Stock issuable upon exercise of the Warrants (collectively, the "*Securities*") will be acquired for investment for Lender's own account, not as a nominee or agent (unless otherwise specified on such Lender's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that Lender has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Lender further represents that Lender does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

5.3. Disclosure of Information. Lender acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities. Lender further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

5.4. Investment Experience. Lender is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, including a complete loss of such investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. The Lender understands that the Company needs to raise substantial equity capital and if the Company is not successful then the Company may not be able to repay the Note and meet the Company's other outstanding obligations.

5.5. Accredited Investor. Lender is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.6. Restricted Securities. Lender understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. Lender represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.7. Further Limitations on Disposition. Without in any way limiting the representations and warranties set forth above, Lender agrees not to make any disposition of all or any portion of the Equity Securities and any Common Stock issuable upon conversion thereof,

unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 5, and:

(a) There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b) Lender has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and, if reasonably requested by the Company, Lender shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in extraordinary circumstances.

5.8. Legends. It is understood that the Securities may bear the following legend:

> "THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

6. Miscellaneous.

6.1. Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, *provided, however*, that the Company may not assign its obligations under this Agreement without the written consent of the Lender. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2. Governing Law. This Agreement and the Note shall be governed by and construed under the laws of the State of Illinois as applied to agreements among Illinois residents, made and to be performed entirely within the State of Illinois.

(a) THE LENDER AND COMPANY AGREE THAT ANY ACTION OR PROCEEDING ARISING, DIRECTLY, INDIRECTLY, OR OTHERWISE, IN CONNECTION WITH, OUT OF, OR FROM THIS NOTE, ANY BREACH HEREOF, OR ANY TRANSACTION COVERED HEREBY SHALL BE RESOLVED, WHETHER BY ARBITRATION OR OTHERWISE, WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. ACCORDINGLY, THE PARTIES CONSENT AND SUBMIT TO THE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED

WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. THE PARTIES FURTHER AGREE THAT ANY SUCH RELIEF WHATSOEVER IN CONNECTION WITH THIS NOTE SHALL BE COMMENCED BY SUCH PARTY EXCLUSIVELY IN THE UNITED STATES FEDERAL OR STATE COURTS, OR IF POSSIBLE BEFORE AN ARBITRAL BODY, LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS.

6.3. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.4. Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5. Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, confirmation of delivery by such courier. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 6.5):

| | |
|---|---|
| If to the Company: | Zunum Aero, Inc.<br>Attn: Chief Executive Officer<br>19820 North Creek Parkway #201<br>Bothell, Washington 98011 |
| With a copy: | __________<br>__________<br>__________<br>__________ |
| If to Lender: | Shazunum, LLC<br>Attn: Jeff Schneider<br>4216 Maray Drive<br>Rockford, Illinois 61107 |
| With a copy: | Timothy J. Leake<br>Hinshaw & Culbertson LLP<br>100 Park Avenue<br>Rockford, Illinois 61101 |

6.6. Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction except as otherwise specifically set forth herein. Lender agrees to indemnify and to hold harmless the Company for the amount of any commission or compensation in the nature of a finder's fee (and the reasonable costs and expenses of defending against such liability or asserted liability) for which Lender or any of its officers, partners, employees or representatives is responsible. The Company agrees to indemnify and hold harmless Lender from for the amount of any commission or compensation in the nature of a finder's fee (and the reasonable costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.7. Expenses. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.8. Entire Agreement; Amendments and Waivers. This Agreement, the Note and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. Nonetheless, any term of this Agreement or the Note may be amended and the observance of any term of this Agreement or the Note may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of both the Company and the Lender. Any waiver or amendment effected in accordance with this Section shall be binding upon each party to this Agreement and each future holder of the Note.

6.9. Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.10. Warrant Agreement. Lender understands and agrees that the exercise of the Warrants into Shares may require Lender's execution of customary investor representations and warranties.

6.11. Acknowledgement. In order to avoid doubt, it is acknowledged that Lender shall be entitled to the benefit of all adjustments in the number of shares of Common Stock of the Company issuable upon conversion or exchange of the Preferred Stock of the Company or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Stock or Preferred Stock underlying the Shares that occur prior to the execution of the Warrants.

6.12. Further Assurance. From time to time, the Company shall execute and deliver to the Lender such additional documents and shall provide such additional information to the Lender as Lender may reasonably require to carry out the terms of this Agreement, the Warrants, and the Note and any agreements executed in connection herewith or therewith, or to be informed of the financial and business conditions and prospects of the Company.

6.13. Survival. The representations and warranties of the Company in this Agreement shall survive until one year after the Closing.

6.14. Use of Proceeds. The Company will (i) use the proceeds from the sale of the Note for general working capital purposes and (ii) not use such proceeds for any distributions to stockholders, repayment of debt, (other than payment of any owed wages and employee benefits), redemptions or repurchases of equity securities or personal, family, or household purposes.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COMPANY:

**Zunum Aero, Inc.**

By: Ashish Kumar
Name: ASHISH KUMAR
Title: CFO

LENDER:

**Shazunum, LLC**

By: [signature]
Name: JEFFREY C SCHNEIDER
Title: MANAGER

*Signature Page to Note Purchase Agreement by Zunum Aero, Inc. and Shazunum, LLC*

**EXHIBIT A**

# EXHIBIT B

# PROMISSORY NOTE

$250,000.00 November 7, 2018

1. DATE AND PARTIES. The date of this Promissory Note, ("Note") is as of November 7, 2018. This Note evidences a loan which includes all extensions, renewals, modifications and substitutions thereof ("Loan"). The parties to this Note and Loan are:

LENDER:

Shazunum, LLC
Attn: Jeffrey Schneider, Manager
4216 Maray Drive
Rockford, Illinois 61107

BORROWER:

Zunum Aero, Inc.
Attn: Chief Executive Officer
19820 North Creek Pkwy
Bothell, WA 98011

2. PROMISE TO PAY. For value received, Borrower promises to pay to Lender's order at its office at the above address, or such other place as Lender may designate, the sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) ("Principal") as follows:

   a. The entire principal balance and plus all accrued and unpaid interest and any other amounts due under this Note shall be due on March 7, 2019 ("Maturity Date").

   b. No interest shall be accrued except as otherwise specifically provided herein in the Event of Default.

   These provisions shall remain in effect until this Note matures or the obligation is accelerated.

3. LOAN FEE. Borrower shall pay to Lender a loan origination fee ("Loan Fee") in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00), payable upon the Maturity Date.

4. PRE-PAYMENT. Borrower may pay without penalty all or a portion of any amount payable under this Note earlier than it is due.

5. APPLICATION OF PAYMENTS. All payments, including but not limited to regular payments or prepayments, received by Lender shall be applied first to accrued unpaid interest, then to Principal and the balance, if any, to late charges and the Loan Fee.

6. DEFAULT. Any of the following shall constitute an "Event of Default" under this Note:

   a. Unless waived in writing by Lender, the failure by any Borrower to make any payment of principal required hereunder;

b. Any material representation, warranty or statement made or furnished by any Borrower in this Note, the Security Agreement or any of the Loan Documents shall be false or misleading in any material respect on the date made;

c. Failure of any Borrower to fully observe or perform any other term, condition, covenant, obligation, condition or agreement contained in this Note, the Security Agreement or any of the Loan Documents and such failure shall continue for ten (10) business days after Borrower's receipt of written notice to Borrower of such failure;

d. A material default or material event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any other material agreement, loan, document or instrument to which any Borrower is obligated to Lender;

e. Borrower shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) cease operations of its business as presently conducted, (iv) make a general assignment for the benefit of its creditors, (v) be dissolved or liquidated, (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, (vii) be adjudicated bankrupt or insolvent, (viii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (ix) take any action for the purpose of effecting any of the foregoing; or

f. The commencement of proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower or of all or a substantial part of its property, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within twenty (20) days of commencement.

7. REMEDIES ON DEFAULT. At the election of Lender, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default. Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default. Lender shall not, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth therein. Upon the occurrence and during the continuance of an Event of Default, Lender: (i) shall

have all rights, powers and remedies set forth in the Security Agreement and/or the other Loan Documents as a secured party under the UCC or as otherwise provided at law or in equity; and (ii) by way of example and not limitation of the forging clause, may liquidate and/or sell any or all of the Collateral wherever it may be found after fifteen (15) days prior written notice to Borrower. Borrower acknowledges that, upon the occurrence of an Event of Default, Lender is authorized to apply the Collateral in whole or in part, and in such order as Lender may elect, to the payment of Borrowers' indebtedness to Lender as evidenced by this Note. The rights, remedies and powers of Lender, as provided in this Note and in all of the other Loan Documents are cumulative and concurrent, and may be pursued singly, successively or together against the Borrower and any other security given at any time to secure the repayment hereof. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, unless such Event of Default has been waived by Lender in writing, Lender may exercise any other right, power or remedy permitted to it by law, either by suit in equity or by action at law, or both.

8. INTEREST ON DEFAULT. From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default (as hereinafter defined), interest shall accrue on the unpaid principal balance during any such period at an annual rate equal to nineteen (19%) (the "Default Rate"). The interest accruing under this section shall be immediately due and payable by Borrower to Lender upon demand and shall be additional indebtedness evidenced by this Note. Interest on this Note shall be calculated on the basis of a 360 day year and the actual number of days elapsed in any portion of a month in which interest is due. If any payment to be made by the Borrower hereunder shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.

9. REPRESENTATIONS AND WARRANTIES OF THE BORROWER. The Borrower hereby represents and warrants to Lender that:

a. Organization, Good Standing, Corporate Power and Qualification. Borrower is a corporation duly incorporated, validly existing and in good standing under the laws of the state of its formation and each has all requisite corporate power and authority to carry on its business as presently conducted. Borrower is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect.

b. Authority. The execution, delivery and performance by Borrower of this Note and the consummation of the transactions contemplated hereby and thereby (i) are within the power of Borrower; and (ii) have been duly authorized by all necessary actions on the part of Borrower.

c. Enforceability. This Note has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as limited by bankruptcy,

insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

d. Non-Contravention. The execution and delivery by Borrower of this Note and the performance and consummation of the transactions contemplated hereby do not and will not: (i) violate any provision of the organizational documents, as amended to the date hereof, or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate, in any material respect, any provision of, or result in the breach or the acceleration of, or entitle any other person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which Borrower is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of Borrower or the suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization or approval applicable to Borrower, its business or operations, or any of its assets or properties.

e. Disclosure. Borrower has made available to Lender all of the information reasonably available to the Borrower that Lender has requested for deciding whether to extend the loan evidenced by this Note. No representation or warranty of the Borrower contained in this Note or in any information provided by the Borrower to Lender, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

10. COLLECTION EXPENSES. Upon the occurrence and during the continuance of an Event of Default, Lender may recover from Borrower all fees and expenses in collecting and enforcing this Note. The foregoing fees and expenses shall include, but not be limited to, Lender's reasonable attorneys' fees and legal expenses.

11. SECURITY. This Note is secured by that certain Security Agreement, dated of even date herewith entered into by Borrower and Lender (as amended, modified, restated and/or replaced from time to time, the "Security Agreement"). The Security Agreement, this Note and any and all other documents now or hereafter given to evidence or secure payment of this Note or delivered to induce the Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, modified, restated and/or replaced from time to time, are hereinafter collectively referred to as the "Loan Documents". As used herein, the term "Collateral" refers to all property encumbered by the Security Agreement.

12. WARRANTS. The Company, in connection with the issuance of this Note, will be issuing a Warrant to Lender for certain shares of preferred stock in the Borrower. The total Warrants issued to Lender will be equal to the number of preferred shares equal to the face value amount of this Note plus the Loan Fee multiplied by 1.5. The strike price of the Warrants shall be seventy-five percent (75%) of the per share price of the shares of preferred stock to be issued by Borrower in the next sale (or series of related sales) by the

Borrower of any preferred stock following the date of this Note from which the Borrower receives gross proceeds of not less than $4,900,000.00 ("Next Equity Financing"). The warrants shall be exercised by the Lender no later than five (5) years after the date in which the Next Equity Financing has resulted in the Borrower receiving gross proceeds of not less than $4,900,000.00. A copy of the form of warrant, showing all rights and obligations thereunder, shall be provided to Lender as soon as practical. Notwithstanding any other provision to the contrary contained herein, this paragraph shall survive the payment of the payment of the entire principal balance and any accrued interest by the Borrower.

13. WAIVERS. To the extent not prohibited by law, Borrower waives, protests, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor. Borrower further agrees that Lender's course of dealing or Lender's forbearance from or delay in the exercise of any of its rights, remedies, privileges or right to insist upon Borrower's strict performance of any provisions contained in this Note shall not be construed as a waiver by Lender, unless such waiver is in writing and is signed by Lender.

14. GENERAL PROVISIONS.

a. AMENDMENT. The provisions contained in this Note may not be amended, except through a written amendment which is signed by Borrower and Lender.

b. GOVERNING LAW. This Note shall be governed by the laws of the State of Illinois, provided that such laws are not otherwise preempted by federal laws and regulations.

c. **THE LENDER AND BORROWER AGREE THAT ANY ACTION OR PROCEEDING ARISING, DIRECTLY, INDIRECTLY, OR OTHERWISE, IN CONNECTION WITH, OUT OF, OR FROM THIS NOTE, ANY BREACH HEREOF, OR ANY TRANSACTION COVERED HEREBY SHALL BE RESOLVED, WHETHER BY ARBITRATION OR OTHERWISE, WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. ACCORDINGLY, THE PARTIES CONSENT AND SUBMIT TO THE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. THE PARTIES FURTHER AGREE THAT ANY SUCH RELIEF WHATSOEVER IN CONNECTION WITH THIS NOTE SHALL BE COMMENCED BY SUCH PARTY EXCLUSIVELY IN THE UNITED STATES FEDERAL OR STATE COURTS, OR IF POSSIBLE BEFORE AN ARBITRAL BODY, LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS.**

d. THE LENDER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE. BY FUNDING THIS NOTE, THE BORROWER

HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE.

e. RECEIPT OF COPY. By signing below, Borrower acknowledges that Borrower has read and received a copy of this Note.

*[Signature Page to Promissory Note]*

BORROWER:

Zunum Aero, Inc.

By: Ashish Kumar
Ashish Kumar
Its: Chief Executive Officer

# EXHIBIT C

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "***Agreement***") is made as of December 19, 2018 (the "***Effective Date***") by and between Zunum Aero, Inc. (formerly known as Tzunum, Inc.), a Delaware corporation (the "***Company***"), and Shadeux LLC, an Illinois limited liability company (the "***Lender***").

## RECITALS

The Company desires to issue and sell and Lender desires to purchase, the Note (as defined below) on the terms and conditions set forth below.

## AGREEMENT

In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree to enter into this Agreement as follows:

1. Definitions.

(a) "***Consideration***" shall mean $250,000.00, which is the amount of money paid by Lender pursuant to this Agreement.

(b) "***Equity Securities***" shall mean the Company's Common Stock or Preferred Stock or any securities conferring the right to purchase the Company's Common Stock or Preferred Stock or securities convertible into, or exchangeable or exercisable for (with or without additional consideration), the Company's Common Stock or Preferred Stock, except any securities or rights to acquire securities that are: (i) issued or issuable by reason of a dividend or stock split, (ii) issued or issuable pursuant to the Company's equity incentive plan or compensatory arrangements approved by the Company's board of directors, including securities issuable upon exercise of such securities, (iii) issued or issuable to banks, equipment lessors or real property lessors pursuant to transactions approved by the Company's board of directors, or (iv) issued or issuable in connection with the Initial Public Offering.

(c) "***Initial Public Offering***" shall mean the closing of the issuance and sale of shares of Equity Securities of the Company in the Company's first underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "***Act***").

(d) "***Maturity Date***" shall mean, with respect to the Note issued under this Agreement, the earlier of (x) June 19, 2019, or (y) ten (10) days after the closing of the Next Equity Financing.

(e) "***Next Equity Financing***" shall mean the next sale (or series of related sales) by the Company Preferred Stock following the date of this Agreement from which the Company receives gross proceeds of not less than $10,000,000.00 (excluding the aggregate amount of debt securities converted into Preferred Stock upon conversion of any existing convertible notes issued by Company).

(f) ***"Preferred Stock"*** shall mean a new series of Company preferred stock with rights and preferences at least pari passu to the most senior equity security issued by Company, other than the issue price, which shall be calculated as provided in Section 1(g) below; *provided that* if the Company has authorized only one class of stock, a new series of Company preferred stock shall be created with rights senior to said class of stock as to liquidation and with other rights similar to customary series A preferred stock based on the National Venture Capital Association model legal documents.

(g) ***"Shares"*** shall, for purposes of determining the type of Equity Securities issuable upon exercise of the Warrants, mean the Preferred Stock issued in the Next Equity Financing.

(h) ***"Warrant Exercise Price"*** shall mean seventy-five percent (75%) of the price paid per share for Preferred Stock by the investors in the Next Equity Financing.

2. Terms of the Note.

2.1. Issuance of Note. In return for the Consideration paid by Lender, the Company shall sell and issue the Promissory Note to Lender as contemplated by this Agreement (the "***Note***"). The Note shall have a principal balance equal to the Consideration paid. The Note shall be due the Maturity Date.

2.2. Loan Fee. Company shall pay to Lender a loan origination fee ("***Loan Fee***") in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00), payable upon the Maturity Date.

2.3. Attorney's Fees. Company shall pay to Lender at Closing the reasonable fees and expenses of the Lender's attorney related to this Agreement, in an amount not to exceed, in the aggregate, One Thousand and 00/100 Dollars ($1,000,00).

2.4. Warrants.

(a) Terms. Upon the closing of the Next Equity Financing, the Company shall issue warrants to Lender for an aggregate exercise price equal to the principal balance of the Note plus the Loan Fee multiplied by 3.0 ("***Warrants***"). At least five (5) days prior to the closing of the Next Equity Financing, the Company shall notify the holder of each Note in writing of the terms under which the Preferred Stock of the Company will be sold in such financing. The strike price of the Warrants shall be the Warrant Exercise Price. The Warrants may be exercised by the Lender no later than eight (8) years after the closing of the Next Equity Financing. Notwithstanding any other provision to the contrary contained herein, the provision of this section shall survive the repayment of the Note by Company.

(b) Form of Warrant. The form of warrant, showing all rights and obligations thereunder, shall be provided to Lender as soon as practical after Closing, and shall be subject to the mutual agreement of the parties as to additional terms and conditions to be contained therein.

3. Closing Mechanics.

3.1. Closing. The closing ("***Closing***") of the purchase of the Note in return for the Consideration paid by Lender shall take place on the date of this Agreement.

3.2. Delivery. At the Closing, the Company will deliver to Lender the Note to be purchased by Lender, against receipt by the Company of the corresponding Consideration. The Note will be registered in Lender's name in the Company's records.

4. Representations and Warranties and Covenants of the Company. In connection with the transactions provided for herein, the Company hereby represents and warrants as of the Closing and, as applied to actions by the Company after the Closing, the following covenants to Lender:

4.1. Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

4.2. Authorization. Except for the authorization and issuance of the shares issuable in connection with the Warrants under Section 2.4, all corporate action has been taken on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Note and the Warrants. Except as may be limited by applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Note and the Warrants, the valid and enforceable obligations they purport to be. Prior to the issuance of the Warrants, the Company shall authorize sufficient shares of Preferred Stock and/or Common Stock, as applicable, to allow for issuance of the Warrants as described in Section 2.4.

4.3. Valid Issuance of Stock. The Shares to be issued, sold and delivered upon exercise of the Warrants will be duly authorized and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Lender in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

4.4. Compliance. The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations. The Company and its subsidiaries (if applicable, and hereafter all references to Company include any subsidiaries) have complied with, and are presently in compliance with all legal requirements applicable to its business as currently conducted and as proposed to be operated as of the date hereof.

4.5. Capitalization. **Exhibit A** attached hereto represents a fully diluted capitalization table of the Company setting forth the number and class of shares held by each stockholder of the Company as of the Effective Date, and the total number of reserved, promised and granted options, warrants, and all other rights, promises or undertakings to subscribe for, purchase or acquire from the Company any share capital of the Company. The stockholders identified in **Exhibit A** are the lawful owners of record and, to the Company's knowledge, beneficial holders, of all of the issued and outstanding share capital of the Company as of the Effective Date and of all rights thereto, and the Company is unaware of the existence or creation of any liens, claims, charges, encumbrances, restrictions, rights, options to purchase, proxies, voting trust and other voting agreements, calls or commitments of any kind among them or between them and any third parties and none of such stockholder owns any other shares, options or other rights to purchase or acquire any share capital of the Company from the Company or, to the Company's knowledge, from each other.

4.6. Intellectual Property. The Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights (free and clear of any third party rights, liens, encumbrances or claims) to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights ("***Intellectual Property***") necessary for its business as now conducted and, to its knowledge, as currently proposed to be conducted, without, to the knowledge of the Company, any conflict with, or infringement of the rights of, others, nor has the Company ever received notice of any such infringement or alleged infringement of any Intellectual Property rights of any third party by the Company. To the Company's knowledge, no Intellectual Property owned by any third party is needed by the Company to conduct its business as currently conducted or as currently proposed to be conducted and that requires the payment of royalties to any third party, except to the extent the Company could obtain rights thereto on commercially reasonable terms. Neither the Company nor, to the Company's knowledge, any of the Company's directors, officers or employees, are obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that is expected to interfere with the use of his or her best efforts to promote the interests of the Company or that is expected to conflict with the Company's business as currently proposed to be conducted. Neither the execution nor delivery of this Agreement or the Note, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as currently conducted and as currently proposed to be conducted, is expected to conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument known to the Company under which any of such employees is now obligated. To the Company's knowledge, it will not be necessary to utilize any inventions of any of the Company's directors, officers or employees (existing, former or people it currently intends to hire) made prior to or outside the scope of their employment by or services to the Company. To the Company's knowledge, at no time in the course of the conception of or reduction of any of the Company's Intellectual Property, was any developer, inventor or other contributor to such Company Intellectual Property operating under any grants from any governmental entity or agency, university, or private source, or subject to any employment agreement, or invention assignment or nondisclosure agreement, or other obligation with any third party, in each case, in a manner that could adversely affect or limit any Intellectual Property owned by or licensed to the Company, or which the Company otherwise has the right to use. To the Company's knowledge, none of the Company's current or former

employees who contributed to the Company's Intellectual Property are or have ever been bound by any obligations towards any third party (including any other employer, government authority, or university) such that such third party may have any right or claim with respect to Intellectual Property developed, invented, discovered, derived, programmed or designed by such employee relating to the business of the Company, as currently conducted. All Company Intellectual Property developed by the existing and former founders of the Company, including any and all Intellectual Property developed prior to or following the incorporation of the Company was duly assigned by each such founder to the Company at the time of the incorporation of the Company or later, free and clear of any security interest. The Company has entered into agreements with each current or former employees and consultants who, either alone or in concert with others, contributed developed, invented, discovered, derived, programmed or designed the Company's Intellectual Property, pursuant to which any and all Intellectual Property necessary for or relevant to the Company's business as currently conducted and, to the Company's knowledge, as now proposed to be conducted, which has been developed or is currently being developed, by such employees or consultants during the course of their employment by or engagement with the Company, or which results from any work performed by the employees or consultants for the Company, or using the Company's facilities or resources, shall be the property solely of the Company for no additional consideration.

4.7. No Litigation. No action, proceeding or governmental inquiry or investigation is pending or, to the Company's knowledge, threatened against the Company or any of its officers, directors, or employees in their capacity as such, and there is no reasonable basis therefor known to the Company (including, without limitation, any action, proceeding, allegation or settlement involving workplace harassment, discrimination or other misconduct of any current or former officer, director, employee, consultant or other person affiliated with the Company), or against any of the Company's properties, assets and rights, including, without limitation, assets, licenses and rights transferred to the Company under any written agreement or other binding undertaking, before any court, arbitration board or tribunal or administrative or other governmental agency having jurisdiction over the Company. The foregoing includes, without limiting its generality, actions pending or threatened involving the prior employment of the Company's employees or use by any of them in connection with the Company's business of any information, property or techniques allegedly proprietary to any of their former employers or any other person. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.

4.8. Boeing HorizonX Ventures, LLC. To the Company's knowledge, the Company has not received any negative communication from Boeing HorizonX Ventures, LLC ("***Boeing***") regarding Boeing's future investments in the Company or Boeings involvement in the Company's projects. The Company has notified Lender of any and all such negative communication it has received from Boeing since October 1, 2018 through the Closing.

5. Representations and Warranties of the Lender. In connection with the transactions provided for herein, Lender hereby represents and warrants to the Company that:

5.1. Authorization. This Agreement constitutes Lender's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the

enforcement of creditors' rights and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. Lender represents that it has full power and authority to enter into this Agreement.

5.2. Purchase Entirely for Own Account. Lender acknowledges that this Agreement is made with Lender in reliance upon such Lender's representation to the Company that any Stock issuable upon exercise of the Warrants (collectively, the "***Securities***") will be acquired for investment for Lender's own account, not as a nominee or agent (unless otherwise specified on such Lender's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that Lender has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Lender further represents that Lender does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

5.3. Disclosure of Information. Lender acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities. Lender further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

5.4. Investment Experience. Lender is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, including a complete loss of such investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. The Lender understands that the Company needs to raise substantial equity capital and if the Company is not successful then the Company may not be able to repay the Note and meet the Company's other outstanding obligations.

5.5. Accredited Investor. Lender is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.6. Restricted Securities. Lender understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. Lender represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.7. Further Limitations on Disposition. Without in any way limiting the representations and warranties set forth above, Lender agrees not to make any disposition of all or any portion of the Equity Securities and any Common Stock issuable upon conversion thereof, unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 5, and:

(a) There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b) Lender has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and, if reasonably requested by the Company, Lender shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in extraordinary circumstances.

5.8. Legends. It is understood that the Securities may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

6. Miscellaneous.

6.1. Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, *provided, however*, that the Company may not assign its obligations under this Agreement without the written consent of the Lender. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2. Governing Law. This Agreement and the Note shall be governed by and construed under the laws of the State of Illinois as applied to agreements among Illinois residents, made and to be performed entirely within the State of Illinois.

(a) THE LENDER AND COMPANY AGREE THAT ANY ACTION OR PROCEEDING ARISING, DIRECTLY, INDIRECTLY, OR OTHERWISE, IN CONNECTION WITH, OUT OF, OR FROM THIS NOTE, ANY BREACH HEREOF, OR ANY TRANSACTION COVERED HEREBY SHALL BE RESOLVED, WHETHER BY ARBITRATION OR OTHERWISE, WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. ACCORDINGLY, THE PARTIES CONSENT AND SUBMIT TO THE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. THE PARTIES FURTHER AGREE THAT ANY SUCH RELIEF WHATSOEVER IN CONNECTION WITH

THIS NOTE SHALL BE COMMENCED BY SUCH PARTY EXCLUSIVELY IN THE UNITED STATES FEDERAL OR STATE COURTS, OR IF POSSIBLE BEFORE AN ARBITRAL BODY, LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS.

6.3. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.4. Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5. Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, confirmation of delivery by such courier. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 6.5):

| | |
|---|---|
| If to the Company: | Zunum Aero, Inc.<br>Attn: Chief Executive Officer<br>19820 North Creek Parkway<br>Bothell, Washington 98011 |
| With a copy: | ________________<br>________________<br>________________<br>________________ |
| If to Lender: | Shadeux LLC<br>Attn: Jeff Schneider<br>4216 Maray Drive<br>Rockford, Illinois 61107 |

6.6. Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction except as otherwise specifically set forth herein. Lender agrees to indemnify and to hold harmless the Company for the amount of any commission or compensation in the nature of a finder's fee (and the reasonable costs and expenses of defending against such liability or asserted liability) for which Lender or any of its officers, partners, employees or representatives is responsible. The

Company agrees to indemnify and hold harmless Lender from for the amount of any commission or compensation in the nature of a finder's fee (and the reasonable costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.7. Expenses. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.8. Entire Agreement; Amendments and Waivers. This Agreement, the Note and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. Nonetheless, any term of this Agreement or the Note may be amended and the observance of any term of this Agreement or the Note may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of both the Company and the Lender. Any waiver or amendment effected in accordance with this Section shall be binding upon each party to this Agreement and each future holder of the Note.

6.9. Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.10. Warrant Agreement. Lender understands and agrees that the exercise of the Warrants into Shares may require Lender's execution of customary investor representations and warranties.

6.11. Acknowledgement. In order to avoid doubt, it is acknowledged that Lender shall be entitled to the benefit of all adjustments in the number of shares of Common Stock of the Company issuable upon conversion or exchange of the Preferred Stock of the Company or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Stock or Preferred Stock underlying the Shares that occur prior to the execution of the Warrants.

6.12. Further Assurance. From time to time, the Company shall execute and deliver to the Lender such additional documents and shall provide such additional information to the Lender as Lender may reasonably require to carry out the terms of this Agreement, the Warrants, and the Note and any agreements executed in connection herewith or therewith, or to be informed of the financial and business conditions and prospects of the Company.

6.13. Survival. The representations and warranties of the Company in this Agreement shall survive until one year after the Closing.

6.14. Use of Proceeds. The Company will (i) use the proceeds from the sale of the Note for general working capital purposes and (ii) not use such proceeds for any distributions to stockholders, repayment of debt, (other than payment of any owed wages and employee

benefits), redemptions or repurchases of equity securities or personal, family, or household purposes.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COMPANY:

**Zunum Aero, Inc.**

By:________________________________

Name:___ B. Matthew Knapp__________

Title:__ ___Founder, Secretary of the Board_

LENDER:

**Shadeux LLC**

By:________________________________

Name: Jeffrey C. Schneider

Title: Manager/Member

*Signature Page to Note Purchase Agreement by Zunum Aero, Inc. and Shadeux LLC*

**EXHIBIT A**

# EXHIBIT D

# PROMISSORY NOTE

$250,000.00 December 19, 2018

1. DATE AND PARTIES. The date of this Promissory Note, ("Note") is as of December 19, 2018. This Note evidences a loan which includes all extensions, renewals, modifications and substitutions thereof ("Loan"). The parties to this Note and Loan are:

LENDER: Shadeux LLC
Attn: Jeffrey Schneider, Manager
4216 Maray Drive
Rockford, Illinois 61107

BORROWER: Zunum Aero, Inc.
Attn: Chief Executive Officer
19820 North Creek Pkwy
Bothell, WA 98011

2. PROMISE TO PAY. For value received, Borrower promises to pay to Lender's order at its office at the above address, or such other place as Lender may designate, the sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) ("Principal") as follows:

   a. The entire principal balance and plus all accrued and unpaid interest and any other amounts due under this Note shall be due on June 19, 2019 ("Maturity Date").

   b. No interest shall be accrued except as otherwise specifically provided herein in the Event of Default.

   These provisions shall remain in effect until this Note matures or the obligation is accelerated.

3. LOAN FEE. Borrower shall pay to Lender a loan origination fee ("Loan Fee") in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00), payable upon the Maturity Date.

4. PRE-PAYMENT. Borrower may pay without penalty all or a portion of any amount payable under this Note earlier than it is due.

5. APPLICATION OF PAYMENTS. All payments, including but not limited to regular payments or prepayments, received by Lender shall be applied first to accrued unpaid interest, then to Principal and the balance, if any, to late charges and the Loan Fee.

6. DEFAULT. Any of the following shall constitute an "Event of Default" under this Note:

   a. Unless waived in writing by Lender, the failure by any Borrower to make any payment of principal required hereunder;

b. Any material representation, warranty or statement made or furnished by any Borrower in this Note, or any of the Loan Documents shall be false or misleading in any material respect on the date made;

c. Failure of any Borrower to fully observe or perform any other term, condition, covenant, obligation, condition or agreement contained in this Note, or any of the Loan Documents and such failure shall continue for ten (10) business days after Borrower's receipt of written notice to Borrower of such failure;

d. A material default or material event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under any other material agreement, loan, document or instrument to which any Borrower is obligated to Lender;

e. Borrower shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) cease operations of its business as presently conducted, (iv) make a general assignment for the benefit of its creditors, (v) be dissolved or liquidated, (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, (vii) be adjudicated bankrupt or insolvent, (viii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (ix) take any action for the purpose of effecting any of the foregoing; or

f. The commencement of proceedings for the appointment of a receiver, trustee, liquidator or custodian of Borrower or of all or a substantial part of its property, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to Borrower or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within twenty (20) days of commencement.

7. REMEDIES ON DEFAULT. At the election of Lender, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default. Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default. Lender shall not, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth therein.

8. INTEREST ON DEFAULT. From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default (as hereinafter defined), interest shall accrue

on the unpaid principal balance during any such period at an annual rate equal to nineteen (19%) (the "Default Rate"). The interest accruing under this section shall be immediately due and payable by Borrower to Lender upon demand and shall be additional indebtedness evidenced by this Note. Interest on this Note shall be calculated on the basis of a 360 day year and the actual number of days elapsed in any portion of a month in which interest is due. If any payment to be made by the Borrower hereunder shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment.

9. REPRESENTATIONS AND WARRANTIES OF THE BORROWER. The Borrower hereby represents and warrants to Lender that:

a. Organization, Good Standing, Corporate Power and Qualification. Borrower is a corporation duly incorporated, validly existing and in good standing under the laws of the state of its formation and each has all requisite corporate power and authority to carry on its business as presently conducted. Borrower is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect.

b. Authority. The execution, delivery and performance by Borrower of this Note and the consummation of the transactions contemplated hereby and thereby (i) are within the power of Borrower; and (ii) have been duly authorized by all necessary actions on the part of Borrower.

c. Enforceability. This Note has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

d. Non-Contravention. The execution and delivery by Borrower of this Note and the performance and consummation of the transactions contemplated hereby do not and will not: (i) violate any provision of the organizational documents, as amended to the date hereof, or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Borrower; (ii) violate, in any material respect, any provision of, or result in the breach or the acceleration of, or entitle any other person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which Borrower is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of Borrower or the suspension, revocation, impairment, forfeiture, or nonrenewal of any permit, license, authorization or approval applicable to Borrower, its business or operations, or any of its assets or properties.

e. Disclosure. Borrower has made available to Lender all of the information reasonably available to the Borrower that Lender has requested for deciding

whether to extend the loan evidenced by this Note. No representation or warranty of the Borrower contained in this Note or in any information provided by the Borrower to Lender, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

10. COLLECTION EXPENSES. Upon the occurrence and during the continuance of an Event of Default, Lender may recover from Borrower all fees and expenses in collecting and enforcing this Note. The foregoing fees and expenses shall include, but not be limited to, Lender's reasonable attorneys' fees and legal expenses.

11. SECURITY. This Note is not secured by a Security Agreement.

12. WARRANTS. The Company, in connection with the issuance of this Note, will be issuing a Warrant to Lender for certain shares of preferred stock in the Borrower. The total Warrants issued to Lender will be equal to the number of preferred shares equal to the face value amount of this Note plus the Loan Fee multiplied by 3.0. The strike price of the Warrants shall be seventy-five percent (75%) of the per share price of the shares of preferred stock to be issued by Borrower in the next sale (or series of related sales) by the Borrower of any preferred stock following the date of this Note from which the Borrower receives gross proceeds of not less than $10,000,000.00 ("Next Equity Financing"). The warrants may be exercised by the Lender no later than eight (8) years after the date in which the Next Equity Financing has resulted in the Borrower receiving gross proceeds of not less than $10,000,000.00. A copy of the form of warrant, showing all rights and obligations thereunder, shall be provided to Lender as soon as practical. Notwithstanding any other provision to the contrary contained herein, this paragraph shall survive the payment of the payment of the entire principal balance and any accrued interest by the Borrower.

13. WAIVERS. To the extent not prohibited by law, Borrower waives, protests, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor. Borrower further agrees that Lender's course of dealing or Lender's forbearance from or delay in the exercise of any of its rights, remedies, privileges or right to insist upon Borrower's strict performance of any provisions contained in this Note shall not be construed as a waiver by Lender, unless such waiver is in writing and is signed by Lender.

14. GENERAL PROVISIONS.

a. AMENDMENT. The provisions contained in this Note may not be amended, except through a written amendment which is signed by Borrower and Lender.

b. GOVERNING LAW. This Note shall be governed by the laws of the State of Illinois, provided that such laws are not otherwise preempted by federal laws and regulations.

c. **THE LENDER AND BORROWER AGREE THAT ANY ACTION OR PROCEEDING ARISING, DIRECTLY, INDIRECTLY, OR OTHERWISE, IN CONNECTION WITH, OUT OF, OR FROM THIS NOTE, ANY**

**BREACH HEREOF, OR ANY TRANSACTION COVERED HEREBY SHALL BE RESOLVED, WHETHER BY ARBITRATION OR OTHERWISE, WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. ACCORDINGLY, THE PARTIES CONSENT AND SUBMIT TO THE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS. THE PARTIES FURTHER AGREE THAT ANY SUCH RELIEF WHATSOEVER IN CONNECTION WITH THIS NOTE SHALL BE COMMENCED BY SUCH PARTY EXCLUSIVELY IN THE UNITED STATES FEDERAL OR STATE COURTS, OR IF POSSIBLE BEFORE AN ARBITRAL BODY, LOCATED WITHIN THE COUNTY OF WINNEBAGO, STATE OF ILLINOIS.**

d. THE LENDER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE. BY FUNDING THIS NOTE, THE BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE.

e. RECEIPT OF COPY. By signing below, Borrower acknowledges that Borrower has read and received a copy of this Note.

*[Signature Page to Promissory Note]*

BORROWER:

Zunum Aero, Inc.

By: ______________________
B. Matthew Knapp
Its: Founder, Secretary of the Board